**PUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

MARK MCWILLIAMS,
Plaintiff-Appellant,

v.

FAIRFAX COUNTY BOARD OF
SUPERVISORS; WARD LEE CASH, JR.;
MIGUEL BOSCHULTE,
Defendants-Appellees,                                   No. 94-1607

and

CARL HELLMANDOLLAR; TREVOR
PINNOCK; DAVID PUCKETT; JAMES
RIDDLE; CHARLES SHELTON; DOUGLAS
WITSMAN; ELMER POWELL,
Defendants.

Appeal from the United States District Court
for the Eastern District of Virginia, at Alexandria.
Albert V. Bryan, Jr., Senior District Judge.
(CA-93-1284)

Argued: January 31, 1995

Decided: January 9, 1996

Before NIEMEYER and MICHAEL, Circuit Judges, and
PHILLIPS, Senior Circuit Judge.

_____

Affirmed by published opinion. Senior Judge Phillips wrote the opin-
ion, in which Judge Niemeyer joined. Judge Michael wrote a dissent-
ing opinion.

_____

**COUNSEL**

**ARGUED:** Marni Elaine Byrum, FITE, O'BRIEN & BYRUM, LTD., McLean, Virginia, for Appellant. Peter Donald Andreoli, Jr., Senior Assistant County Attorney, Fairfax, Virginia, for Appellees. **ON BRIEF:** Edna Ruth Vincent, FITE, O'BRIEN & BYRUM, LTD., McLean, Virginia, for Appellant. David P. Bobzien, County Attorney, Robert Lyndon Howell, Deputy County Attorney, Fairfax, Virginia, for Appellees.

_____

**OPINION**

PHILLIPS, Senior Circuit Judge:

Mark McWilliams, an employee of Fairfax County, Virginia, appeals the dismissal by summary judgment of his claims under Title VII and 42 U.S.C. § 1983 against the Fairfax County Board of Supervisors (the County) and two of its supervisor-employees growing out of alleged acts of sexual harassment and physical abuse of McWilliams by fellow-employees. Reviewing the grant of summary judgment de novo, we affirm.

I.

The facts as construed most favorably to McWilliams from the summary judgment record are as follows.

Sometime in mid-1987, the Newington Facility of the Fairfax County Equipment Management Transportation Agency (EMTA) hired McWilliams as an automotive mechanic. At that time, McWilliams informed the facility of a learning disability that had arrested his cognitive and emotional development. Miguel Boschulte acted as McWilliams' supervisor from approximately September 1987 until November 1991. From November 1991 until September 1992, Ward Lee Cash replaced Boschulte as McWilliams' supervisor.

Beginning sometime in 1989, McWilliams' coworkers, collectively known as the "lube boys," beset McWilliams with a variety of

2

offensive conduct. They teased him, asked him about his sexual activities, and exposed themselves to him. They taunted him with remarks such as, "The only woman you could get is one who is deaf, dumb, and blind." On one occasion, a coworker who sometimes took on supervisory responsibilities placed a condom in McWilliams' food.

The conduct involved physical assaults. On at least three occasions, coworkers tied McWilliams' hands together, blindfolded him, and forced him to his knees. On one of these occasions, a coworker placed his finger in McWilliams' mouth to simulate an oral sexual act. During another of these incidents, a coworker, Doug Witsman, and another placed a broomstick to McWilliams' anus while a third exposed his genitals to McWilliams. On yet another occasion, Witsman entered the bus on which McWilliams was working and fondled him.

The atmosphere of the all-male workplace at EMTA was heavily focused on sex. Copies of Playboy magazine and a variety of pornographic material were displayed in the bathrooms. Centerfold pictures as well as Snap-On-Tool calendars of scantily clad women were placed in and around mechanics' tool boxes. Off-color cartoons were circulated around the workplace. The radio was often tuned to talk shows that featured explicit sexual references.

On three occasions, McWilliams complained about certain of these matters to his supervisors. None involved incidents of physical abuse. In the spring or summer of 1991, he complained to Boschulte about the incident in which his coworker had placed a condom in his food. In response, Boschulte held a meeting with McWilliams' coworkers to discuss the incident. On July 22, 1992, McWilliams complained to Cash that Doug Witsman had offered him money for sex. Later in July, McWilliams told Cash that Witsman was "flicking his tongue at [him] and saying `I love you, I love you.'" When questioned by Cash, Witsman admitted that he may have said something that McWilliams had taken the wrong way. Witsman then promised Cash that he would not "tease or harass Mr. McWilliams any more, any time."

McWilliams proffered evidence that others than he had informed EMTA supervisors about the lube boys' conduct and the general workplace environment. McWilliams deposed that Mike Stutzman, an

3

assistant supervisor, had informed Cash that the lube boys were taunting McWilliams and exposing themselves to him. Hannon Wallace Davis, a coworker, deposed that Stutzman, had told him of a conversation between Stutzman and Cash in which Stutzman had warned Cash that, although he did not know what was going on, the lube boys were engaging in horseplay and Cash ought to investigate the situation. McWilliams' name was not mentioned during the conversation. Davis further deposed that he thought McWilliams had complained to Billy Davis, a night foreman, about the lube boys and that Billy Davis had then informed Buck George, the day-shift superintendent.

In August 1992, Cash noticed that McWilliams appeared distraught. When he questioned McWilliams about his emotional state, McWilliams replied that he was upset about his parents' divorce, a failed relationship with a woman, and a potential reduction in force at EMTA. Cash then referred McWilliams to the County's Employee Assistance Program. Once there, McWilliams was diagnosed with severe emotional problems, which caused him to leave his employment in September 1992 on medical leave.[1]

On October 12, 1992, McWilliams informed EMTA management that he had been sexually abused by Witsman. The following day, the County initiated an investigation of McWilliams' allegations and the County Police Department began a criminal investigation of Witsman. In January 1993, McWilliams filed a charge with the Equal Employment Opportunity Commission (EEOC), alleging discrimination on the basis of sex and disability. The EEOC issued a right-to-sue letter on July 14, 1993, and on October 13, 1993, McWilliams commenced this action in federal district court. He alleged claims of workplace sex discrimination under Title VII against the County, related claims under 42 U.S.C. § 1983 against the County and his supervisors Cash and Boschulte for alleged constitutional violations, and other related claims under state tort law against his supervisors and several of his coworkers.[2] Following discovery, the defendants

_____

[1] After his accumulated leave was exhausted, the County extended him additional leave through March 1993. From March 1993 until March 1994, McWilliams was carried by the County as an employee without pay. In March 1994, he was officially terminated.
[2] McWilliams also alleged claims under the Americans With Disability Act, which were later dismissed voluntarily.

4

moved for summary judgment on each of McWilliams' claims. Concluding that neither the County nor Cash or Boschulte had either actual or constructive knowledge of the coworkers' conduct on which the various claims were based, the district court granted those defendants' motion for summary judgment on the Title VII and § 1983 claims. The court then dismissed without prejudice the state claims against McWilliams' supervisors and coworkers.

This appeal by McWilliams challenging the grant of summary judgment in favor of the County, Cash, and Boschulte followed.**3** We review the dismissal by summary judgment de novo . Overstreet v. Kentucky Central Life Ins. Co., 950 F.2d 931, 938 (4th Cir. 1991).

II.

McWilliams first contends that the district court erred in dismissing his Title VII claim of sexual harassment against the County.

Under Title VII of the Civil Rights Act of 1994, it is "an unlawful employment practice for an employer . . . to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C.§ 2000e-2(a)(1). Two forms of workplace sexual harassment have been held to constitute discrimination "because of" one's sex, hence to offend this statute: (1) quid pro quo harassment, in which an employer requires sexual favors of an employee in exchange for the benefits of employment, and (2) sexually-oriented harassment by one's fellow-employees sufficiently egregious to create a "hostile workplace environment" that is knowingly tolerated by the employer. McWilliams' claim is solely one of hostile-environment harassment.

An employee claiming hostile-environment sexual harassment by his employer must prove: (1) that the conduct in question was unwel-

_____

**3** Though McWilliams purports to challenge the district court's dismissal of Title VII claims against Cash and Boschulte, no such claims were actually pleaded against those defendants, but only § 1983 claims. McWilliams does not challenge dismissal of his state-law claims which we are advised have been refiled in state court.

5

come, (2) that the harassment was based on his sex, (3) that the harassment was sufficiently pervasive or severe to create an abusive working environment, and (4) that some basis exists for imputing liability to the employer. Swentek v. USAir, Inc. , 830 F.2d 552, 557 (4th Cir. 1987).

The County raises serious questions as to whether McWilliams has proffered sufficient admissible evidence to support the necessary finding that any of his supervisors, hence the County, were on actual or constructive notice of coworker conduct sufficient to have created a hostile workplace environment. We need not address those problems, however, for we hold that McWilliams' hostile-environment claim fails for the more fundamental reason that such a claim does not lie where both the alleged harassers and the victim are heterosexuals of the same sex.[4] Here, both McWilliams and all his alleged harassers were indisputably males, and no claim is made that any was homosexual.[5]

_____

[4] It is important to emphasize that our holding of non-cognizability is not just limited to claims involving only heterosexual males but, further within that set, to claims of hostile-environment "harassment" claims. Our holding does not, therefore, purport to rule out claims of discrimination by adverse employment decisions (hiring, firing, etc.) involving only same-sex heterosexual actors (e.g., male employee fired by male employer who prefers females for particular work). Nor, most significantly, does it purport to reach any form of same-sex discrimination claim where either victim or oppressor, or both, are homosexual or bisexual (hereafter "homosexual").

We therefore specifically reserve decision on the general question whether, when all the actors involved in a Title VII claim of sex-discrimination (in any of its forms) are of the same sex, the homosexuality of any may make the claim nevertheless cognizable as one of "discrimination because of [the victim's] sex." Because we do not reach it, it suffices here simply to note that the Supreme Court has not addressed the issue and that the lower federal courts which have are hopelessly divided. See Quick v. Donaldson, 895 F. Supp. 1288, 1294 (S.D. Iowa 1995) (recent survey of cases revealing the current state of the division).

[5] Though there is no allegation or proffered proof that either McWilliams or any of the "lube boys" was in fact homosexual, our dissent-

We believe this result compelled by a commonsense reading of the critical causation language of the statute: "because of the [claimant's] sex". As a purely semantic matter, we do not believe that in common understanding the kind of shameful heterosexual-male-on-heterosexual-male conduct alleged here (nor comparable female-on-female conduct) is considered to be "because of the [target's] `sex.'" Perhaps "because of" the victim's known or believed prudery, or shyness, or other form of vulnerability to sexually-focussed speech or conduct. Perhaps "because of" the perpetrators' own sexual perversion, or obsession, or insecurity. Certainly, "because of" their vulgarity and insensitivity and meanness of spirit. But not specifically "because of" the victim's <u>sex</u>.

The difficulty of construing this causation language to reach such same-sex claims and the commonsense of not doing so are empha-

_____

ing brother apparently would either find that fact properly inferable from the nature of some of the harassing conduct, or consider it unnecessary to prove homosexuality-in-fact, homosexual innuendo being sufficient. And, on this basis he would reach the homosexuality issue and hold that same-sex "harassment" claims may lie under Title VII where homosexuality (either in-fact or as merely suggested by conduct) is involved. With respect, we believe that were Title VII to be so interpreted, the fact of homosexuality (to include bisexuality) should be considered an essential element of the claim, to be alleged and proved. The dissent expresses concern, because of proof (and privacy?) problems, about requiring such allegation and proof, but we believe it critical and eminently fair to require it if homosexuality is to be the critical fact making same-sex harassment claims cognizable under Title VII. The (ordinarily different) sexes of the relevant actors always has been an essential element of either form of Title VII sexual harassment claims. If such claims were to reach past different-sex to same-sex situations where homosexuality of one or the other or both of the actors is involved, that added fact would seem equally essential to the statement and proof of such a claim. If not required to be alleged, a defendant could be blindsided by proof of conduct merely suggestive of homosexuality between persons of the same sex who actually are heterosexuals. If not required to be proved, the sexual harassment claim would effectively have been extended to cover any conduct between even same-sex heterosexual workers that included sufficient homosexual innuendo. For these reasons, we do not believe that the homosexual issue properly can be considered to be presented in this case.

7

sized when the practical implications are considered. That this sort of conduct is utterly despicable by whomever experienced; that it may well rise to levels that adversely affect the victim's work performance; and that no employer knowingly should tolerate it are all undeniable propositions. But to interpret Title VII to reach that conduct when only heterosexual males are involved as harasser and victim would be to extend this vital statute's protections beyond intentional discrimination "because of" the offended worker's "sex" to unmanageably broad protection of the sensibilities of workers simply "in matters of sex." We cannot believe that Congress in adopting this critical causation language and the Supreme Court in interpreting it to reach discrimination by the creation of hostile workplace environments could have intended it to reach such situations. There perhaps "ought to be a law against" such puerile and repulsive workplace behavior even when it involves only heterosexual workers of the same sex, in order to protect the victims against its indignities and debilitations, but we conclude that Title VII is not that law.

McWilliams' Title VII claim was therefore properly dismissed by summary judgment.

III.

McWilliams also challenges the dismissal of his several claims under 42 U.S.C. § 1983 against the County and supervisors Cash and Boschulte in their individual capacities. These claims, all based essentially on the same conduct as that upon which his Title VII sex-harassment claim was based, confusedly alleged violations by the County and the two supervisor-defendants of several constitutional rights incident to McWilliams' harassment by his coworkers. Only two warrant discussion.**6**

_____

**6** In addition to the § 1983 claims discussed in the text that follows, McWilliams also (apparently) claimed a violation of procedural due process rights; an equal protection violation in that his coworkers (as state-actors?) invidiously discriminated against him on the basis of his learning disability; and a claim that by failure to put a stop to his coworkers non-physical sexual harassment, the County (and his supervisors?) violated his substantive due process rights.

We have considered these and think none has any merit that warrants discussion.

8

A.

The principal claim under § 1983 was that by tolerating the work-place harassment suffered by McWilliams, these defendants violated his rights under the Equal Protection Clause not to be discriminated against on account of his gender. This claim of course is perfectly parallel to the hostile workplace claim brought under Title VII. While such parallel constitutional claims may lie in appropriate situations where, as here, the employer is a state-actor, see Beardsley v. Webb, 30 F.3d 524, 529 (4th Cir. 1994), that of McWilliams fails for the same reason we found his parallel Title VII claim not cognizable under that statute. We do not believe that the protection afforded by the Equal Protection Clause against invidious gender discrimination extends, any more than does the protection of Title VII, to acts of harassment by persons who are of the same gender and as those of the public employee-victim.

Without regard then to whether, as the district court thought, these defendants could not be charged with the requisite knowledge of harassing conduct, McWilliams' equal protection claim was rightly dismissed as one not involving invidious gender discrimination.

B.

The other § 1983 claim that warrants brief discussion is one seeking to hold the County and the two supervisor-defendants liable for a deprivation of McWilliams' substantive due process rights resulting from the instances of actual physical assaults that allegedly occurred during his coworkers' general course of harassment.

In order to hold his supervisors and his local government employer liable on such a claim, McWilliams must prove (1) that the injury alleged was caused by a violation of some settled constitutional right, and (2) that the individual supervisors and the local government employer were liable under some recognized theory of direct fault. See Collins v. City of Harker Heights, #6D6D 6D# U.S. ___, ___, 112 S. Ct. 1061, 1066 (1992).

We may assume that McWilliams' proffer of evidence sufficed to support a finding that he suffered constitutional injury as a result of

9

the physical assaults allegedly involved in the course of his general harassment by coworkers. The Due Process Clause of the Fourteenth Amendment affords, as one of its components, "substantive" protection against unreasonable bodily intrusions by state-actors. See, e.g. Hall v. Tawney, 621 F.2d 607, 613 (4th Cir. 1980) (unreasonable paddling of public school student by school official could violate substantive due process right). The physical assaults alleged by McWilliams would, if proven, constitute the infliction of constitutional injury.

The problem, however, is with imposing liability for the infliction of the injury on persons--here supervisors and the municipal employer of the direct perpetrators--who did not engage in the specific conduct that inflicted injury. It cannot be done on any theory of vicarious liability; principles of respondeat superior do not apply in imposing liability under § 1983. Monell v. Dept. of Social Servs. of the City of New York, 436 U.S. 658, 692-94 (1978). Neither the supervisors in their individual capacities nor the County could be held liable except by proof of their direct culpability in causing the injury to be inflicted by subordinate employees. Id. at 694; see Shaw v. Stroud, 13 F.3d 791 (4th Cir. 1994) (bases for supervisor liability); Spell v. McDaniel, 824 F.2d 1380 (4th Cir. 1987) (bases for municipal liability).

Liability might be imposed upon the supervisor-defendants, Cash and Boschulte, only by proof of their direct culpability in causing the injury either by directly authorizing it or by expressly or tacitly condoning by inaction a known pattern of comparable coworker conduct. See Shaw, 13 F.3d at 798-99. There is of course no evidence that either supervisor directly authorized the physical assaults or expressly condoned a known pattern of comparable conduct. To establish culpability by tacit condonation, the only remaining possibility, McWilliams must have proffered evidence that the supervisors knew or reasonably should have known of a comparable pattern of coworker conduct that was sufficiently widespread to pose a pervasive and unreasonable risk of constitutional injury to McWilliams, and that in the face of that knowledge they took no action to stop it but remained deliberately indifferent to it. See Slakan v. Porter, 737 F.2d 368, 372-73 (4th Cir. 1984). McWilliams' proffer of evidence here failed on the threshold requirement that Cash or Boschulte knew or had any reason to know of the specific incidents of physical assault (as

10

opposed to teasing and "horseplay") that alone could have involved violation of substantive due process rights. McWilliams repeatedly conceded he had never spoken to anyone, particularly to these two supervisors, about those specific incidents of physical assaults. J.A. 245, 254, 259, 260, 263.

The district court did not, therefore, err in dismissing McWilliams' substantive due process claim against Cash and Boschulte.

For essentially the same reasons, McWilliams' substantive due process claim against the County did not suffice to withstand summary judgment. The only available theory, roughly paralleling that of supervisor liability, upon which the County's liability might be based was that the County, through its "final decisionmakers," was itself directly culpable in the infliction of the constitutional injury by its agents. This might be established by proof either that a policy for which it was responsible was the effective cause of its employees' infliction of the injury, or that the County had effectively condoned the employees' conduct by inaction in the face of actual or constructive knowledge that it was occurring and that unless stopped it would almost surely result in the very constitutional injury alleged to have been suffered by McWilliams. See Canton v. Harris, 489 U.S. 378 (1989); Spell, 824 F.2d at 1385-88.

Here, McWilliams sought to invoke a "policy-as-effective-cause" theory of municipal liability by pointing to deficiencies amounting to "policy" in the County's training program for employees such as the "lube-boys." This is a viable theory, see id. at 1389, but the evidence proffered to support it was, however, wholly lacking on the critical requirement that a direct causal connection between specific deficiencies and specific injury be demonstrated. Cf. id. at 1390 (police training). The only possible evidence of any such causal connection was that this injury did occur and that whatever training had or had not been provided did not serve to prevent it. This simply cannot, for obvious reasons, suffice. See Oklahoma City v. Tuttle, 471 U.S. 808 (1985); Spell, 824 F.2d at 1391.

McWilliams' attempt to invoke the "condoned-custom-as-effective-cause" theory of municipal liability was similarly lacking in even minimal evidentiary support. There simply was no proffered evi-

11

dence in the summary judgment record of any pattern, known or unknown to the County, of pervasive conduct by its employees of the type that allegedly befell McWilliams.

The district court did not err, therefore, in dismissing McWilliams' § 1983 claims against the County, Cash and Boschulte.

AFFIRMED

MICHAEL, Circuit Judge, dissenting:

It is too early to write this case off to meanness and horseplay. For now there is a material factual issue whether McWilliams was discriminated against because of his sex.[1] In addition, McWilliams has forecast sufficient facts to survive summary judgment on the issue of whether his employer had sufficient knowledge of the Title VII violations to be held accountable. I, therefore, respectfully dissent.

I.

I believe the majority makes a mistake to affirm summary judgment on the ground that there is no allegation that McWilliams and his male harassers are of different sexual orientations. That puts too fine a point on the "discriminat[ion] . . . because of [his] . . . sex" issue. I would simply hold that Title VII is implicated whenever a person physically abuses a co-worker for sexual satisfaction or propositions or pressures a co-worker out of sexual interest or desire. This can be established by an account of what the harasser did or said to the victim, and proof of the harasser's sexual orientation should not be required. The harassment must, of course, be sufficiently pervasive to create a hostile working environment.

_____

[1] I would find same-sex harassment in the workplace to be actionable under Title VII. See, e.g., Sardinia v. Dellwood Foods, Inc., 1995 U.S. Dist. LEXIS 16073, *8 ("dominant trend" is to allow such claims) (S.D.N.Y. Oct. 30, 1995), interlocutory appeal certified, 1995 U.S. Dist. LEXIS 17967 (S.D.N.Y. Nov. 29, 1995); King v. M.R. Brown, Inc., 1995 U.S. Dist. LEXIS 14211, *14 (E.D. Pa. Sept. 22, 1995) ("the trend is to permit such claims to proceed").

I recognize that in a same-sex harassment claim, evidence of sexual orientation could be relevant to either side's case. However, it should not be elevated to a required element of the plaintiff's proof. See Mogilefsky v. Superior Court, 20 Cal. App. 4th 1409, 1416 (1993). That would burden the statute too much because the focus would shift from an examination of what happened to the plaintiff to a pursuit (surely to be complicated, far-ranging and elusive) of the "true" sexual orientation of the harasser.

Here, McWilliams alleges that his co-workers (i)"approach[ed] him in a sexual manner, touch[ed] him," Amend. Compl. ¶6, (ii) "asked him to perform sexual acts on them," id. ¶7, and (iii) "restrained him and touched him in a sexual manner," id. ¶8. The details are amply provided in the summary judgment record. On several occasions defendant Witsman told McWilliams that he wanted to have sex with him. At least once Witsman offered McWilliams money for sex. Witsman would do things such as flick his tongue at McWilliams, say "I love you, I love you," and ask for sex. Witsman would also follow McWilliams into the restroom where Witsman, with one hand in his unzipped fly, would put his arm around McWilliams or invite him into a stall. On several occasions Witsman asked McWilliams if he (Witsman) could masturbate McWilliams. Once when McWilliams was working under the dashboard of a bus, Witsman came up and rubbed McWilliams' penis until it became erect. At least three times defendants Pinnock, Riddle and Witsman tied McWilliams' hands together, blindfolded him and pushed him to his knees. During one of these incidents Witsman put his finger in McWilliams' mouth and simulated a sex act. In a separate incident, Riddle and Witsman held McWilliams down while Pinnock exposed himself and defendant Shelton put a broom handle between McWilliams' buttocks. These assaults and propositions were against the backdrop of constant, obsessive talk about sex -- and not just male-female sex. One defendant even talked about having sex with little boys.

I would not require McWilliams to allege on top of these facts that his harassers were homosexual. The acts of assault and harassment are sufficiently direct and suggestive by themselves to raise the question whether they were done "because of [McWilliams'] . . . sex."

13

I appreciate the majority's concern that Title VII not be trivialized to encompass claims for horseplay of a sexual variety. Fortunately, courts are already dealing with this concern and are distinguishing between actionable hostility and non-actionable horseplay. E.g., Reed v. Shepard, 939 F.2d 484, 491 (7th Cir. 1991) (plaintiff who relished sexual horseplay could not recover under Title VII); Easton v. Crossland Mortgage Corp., 1995 U.S. Dist. LEXIS 15889, *37-40 (C.D. Cal. 1995) (same); Niccoli v. Runyon, 1995 U.S. Dist. LEXIS 14499, *10 & n.9 (E.D. Va. 1995); Quick v. Donaldson Co., 895 F. Supp. 1288, 1296 (S.D. Iowa 1995) ("To say `bagging'[sneaking up behind a man and grabbing a testicle] is merely horseplay is to trivialize its cruel and physical nature. Yet, to say `bagging' is purely a sexually motivated activity exaggerates the sexual component involved [because the `baggers' were neither] demanding sexual favors, [nor] were expressing sexual interest."); Taylor v. Nat'l Group of Cos., 872 F. Supp. 462, 464 (N.D. Ohio 1994) (jury question presented as to whether conduct was merely horseplay engaged in"in a spirit of jocularity" or was "sexually hostile"); D.R. v. Middle Bucks Area Voc. Tech. School, 1991 U.S. Dist. LEXIS 1292, *19-20 (E.D. Pa. 1991) (school held not liable under 42 U.S.C. § 1983 when it had no knowledge of sexual assaults and harassment but knew only of "non-criminal horseplay" and "inappropriate and incorrigible classroom behavior"), aff'd en banc, 972 F.2d 1364 (3d Cir. 1992), cert. denied, 113 S. Ct. 1045 (1993); Smith v. Acme Spinning Co., 40 Fair Empl. Prac. Cas. (BNA) 1104, 1105 (W.D.N.C. 1986) ("on-the-job horseplay" in which plaintiff voluntarily participated and sometimes initiated not actionable as hostile environment sexual harassment); Vermett v. Hough, 627 F. Supp. 587, 599 (W.D. Mich. 1986) (plaintiff found office horseplay to be amusing, except when she was the target of the joke; Title VII claim denied).

McWilliams has forecast sufficient evidence of abuse and pressure to avoid summary judgment on the basis of horseplay. The facts, construed in McWilliams' favor, are sufficient to show that he was subject to a hostile work environment because of his sex. I would remand his Title VII claim for a trial.

II.

The district court also erred in granting the Board of Supervisors summary judgment on the Title VII claim on the ground that the Board lacked actual or constructive knowledge of the hostile work-place environment to which McWilliams was subjected. [2] McWilliams' Title VII claim against the Board is viable if knowledge about the abuse he suffered "was imputable on some factual basis to" it. Spicer v. Commonwealth of Virginia, 66 F.3d 705, 710 (4th Cir. 1995) (en banc).

McWilliams produced sufficient evidence to create a genuine issue of material fact as to whether the EMTA supervisors had actual knowledge of a Title VII violation. McWilliams complained to supervisor Lee Cash at least three times that his co-workers were "teasing him about girls and other things."[3] Later, McWilliams expressly complained to Cash about the way Witsman would flick his tongue at him and say, "I love you, I love you." Mike Stutsman, an assistant supervisor at EMTA, told Cash that the teasing was sexual in nature and involved indecent exposure. Billy Davis, EMTA's night foreman, also told Cash and another supervisor, Miguel Boschulte, as well as Buck George, EMTA's day shift superintendent, that McWilliams was being harassed. Cash also learned from Witsman himself that Witsman had been teasing McWilliams. Another superintendent, Frank Knapp, held a meeting to discuss the way McWilliams was being mistreated. Two back-up supervisors, Dave Puckett and John Bowden, even participated in the condom incident described by the majority. See ante at 3. These facts about the supervisors' knowledge of the harassment provide an ample basis for imputing knowledge to the Board.

* * *

For all of these reasons, I would allow McWilliams to proceed with his Title VII claim.

_____

[2] Because it affirms on other grounds, the majority does not reach this issue.

[3] Because Cash knew that McWilliams was learning-disabled and found it difficult to communicate at an adult level, Cash should have inquired further at this point.

15